1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT TACOMA

10   LAURIE J. GOODWIN,

11                     Plaintiff,              CASE NO. 10cv5783-BHS-JRC

12        v.                                   REPORT AND
                                               RECOMMENDATION ON
13   MICHAEL J. ASTRUE, Commissioner           PLAINTIFF'S COMPLAINT
     of the Social Security Administration,
14                                             NOTED FOR: January 13, 2012

15                     Defendant.

16

17         This matter has been referred to United States Magistrate Judge J. Richard

18   Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR

19   4(a)(4), and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261,

20   271-72 (1976). This matter has been fully briefed. (See ECF Nos. 11, 13, 16).

21         Based on the relevant record, the Court concludes that the ALJ erred in her review

22   of plaintiff's credibility and erred in her review of the medical evidence provided by one

23   of plaintiff's treating physicians. For these reasons, this matter should be reversed and

24

remanded pursuant to sentence four of 42 U.S.C. § 405(g) to the Commissioner for further administrative proceedings. Defendant's Motion to Strike should be granted.

## BACKGROUND

Plaintiff, LAURIE J. GOODWIN, was forty-six years old on her alleged disability onset date of September 10, 2001 (Tr. 104). She worked as a psychiatric social worker from 1984 until 1999 (Tr. 26, 117). She quit her employment in 1999 in order to spend time with her daughter (see id.). Although she intended to return to work, she alleged that she could not do so as of September 10, 2001 due to her back condition (Tr. 26-27, 116, 117).

## PROCEDURAL HISTORY

In February, 2007 plaintiff filed an application for Social Security disability benefits, alleging that she had been disabled since September 10, 2001 (Tr. 104-06). Her application was denied initially and following reconsideration (Tr. 63-76). Plaintiff's requested hearing was held before Administrative Law Judge Laura Valente ("the ALJ") on August 14, 2009 (Tr. 20-62). On September 1, 2009, the ALJ issued a written decision in which she found that plaintiff was not disabled pursuant to the Social Security Act through March 31, 2005 -- the date through which plaintiff was insured (see Tr. 7-19).

On August 20, 2010, the Appeals Council denied plaintiff's request for review, making the written decision by the ALJ the final agency decision subject to judicial review (Tr. 1-5). See 20 C.F.R. § 404.981. On October 22, 2010, plaintiff filed a complaint in this Court, seeking judicial review of the ALJ's written decision (see ECF

No. 1). On February 25, 2011, defendant filed the sealed administrative record ("Tr.") regarding this matter (see ECF No. 7).

In her Opening Brief, plaintiff contends that: (1) the ALJ erred in her assessment of the medical evidence; (2) the ALJ erred in her assessment of plaintiff's testimony; (3) the ALJ erred in her assessment the lay testimony; (4) the ALJ erred in her assessment of plaintiff's residual functional capacity; (5) the ALJ erred by finding that plaintiff was capable of performing her past relevant work; and, (6) the ALJ erred in step five of the sequential disability evaluation process by failing to find that plaintiff was disabled (see ECF No. 11, p. 2). Plaintiff contends that this matter should be remanded with a direction to the Commissioner to find plaintiff disabled, but requests that if this matter is reversed and remanded, that it be assigned to a different Administrative Law Judge (see id., p. 18-20).

STANDARD OF REVIEW

Plaintiff bears the burden of proving disability within the meaning of the Social Security Act (hereinafter "the Act"). Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999); see also Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment "which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Plaintiff is disabled under the Act only if plaintiff's impairments are of such severity that plaintiff is unable to do previous work, and cannot, considering the plaintiff's age, education, and work experience, engage in any other

substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such "'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (quoting Davis v. Heckler, 868 F.2d 323, 325-26 (9th Cir. 1989)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The Court "'must independently determine whether the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" See Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2006) (citing Moore v. Comm'r of the Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of SSA, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (other citation omitted)); see also Stout v. Commissioner of Soc. Sec., 454 F.3d 1050, 1054 (9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the agency did not

invoke in making its decision") (citations omitted). For example, "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony." <u>Stout</u>, <u>supra</u>, 454 F.3d at 1054 (*citing* <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993)). In the context of social security appeals, legal errors committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate disability conclusion. <u>Stout</u>, <u>supra</u>, 454 F.3d at 1054-55 (reviewing legal errors found to be harmless).

<u>DISCUSSION</u>

1. <u>Defendant's Motion to Strike plaintiff's Appendix</u>

As a preliminary matter, the Court notes that defendant has moved to strike the Appendix to plaintiff's Opening Brief (<u>see</u> Defendant's Brief, ECF No. 13, pp. 1-2). Plaintiff admits that she did not inform counsel for defendant of her intention to file an over-length brief (<u>see</u> Reply, ECF No. 16, pp. 1-2). The Court notes that plaintiff did not receive permission from this Court to file an over-length brief, which is required by Local Rule CR 7(f).

The Court's Order Setting Briefing Schedule in this case specifies that the "length of the briefing shall conform to Local Rule CR 7(e)(3)" (<u>see</u> ECF No. 6). Therefore, according to Local Rule CR 7(e)(3), the Opening Brief and the Response Brief "shall not exceed twenty-four pages."

The Court notes that plaintiff's Opening Brief is twenty one pages long (<u>see</u> ECF No. 11). Plaintiff's appendix is twenty five pages long (<u>see</u> <u>id.</u>, Appendix). Plaintiff indicates that the Appendix was filed "because the evidence in this case was lengthy, and her attorney was unable to edit the evidence down to where it would fit within a 24 page

brief" (see Reply, ECF No. 16, p. 1). Plaintiff also indicates that her "Opening Brief can stand independently; all of the key medical evidence from the Appendix is also cited and discussed in the Opening Brief" (see id., p. 2).

Plaintiff does not attempt to justify the failure to seek this Court's permission to file an over-length brief. According to Local Rule CR 7(f), motions seeking approval to file an over-length motion or brief "shall be filed as soon as possible but no later than three days before the underlying motion or brief is due." Therefore, the Court concludes that plaintiff violated this Court's Order, Local Rule CR 7(e)(3) and Local Rule CR 7(f) (see Order Setting Briefing Schedule, ECF No. 6).

The Court also finds that the particular Appendix in this matter did not provide much assistance to the Court. For the reasons stated, the Court should grant defendant's Motion to Strike plaintiff's Appendix.

2. The ALJ erred in the evaluation of the medical evidence provided by one the treating physicians.

"A treating physician's medical opinion as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not inconsistent with the other substantial evidence in the case record." Edlund v. Massanari, 2001 Cal. Daily Op. Srvc. 6849, 2001 U.S. App. LEXIS 17960 at *14 (9th Cir. 2001) (citing SSR 96-2p, 1996 SSR LEXIS 9); see also 20 C.F.R. § 416.902 (non-treating physician is one without "ongoing treatment relationship"). "The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted."

_Batson v. Commissioner of Social Security Administration_, 359 F.3d 1190, 1195 (9th Cir. 2004) (_quoting_ Magallanes, supra, 881 F.2d at 751).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996) (_citing_ Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)). Even if a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, supra, 81 F.3d at 830-31 (_citing_ Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating h[er] interpretation thereof, and making findings." Reddick, supra, 157 F.3d at 725 (_citing_ Magallanes, supra, 881 F.2d at 751).

In addition, the ALJ must explain why her own interpretations, rather than those of the doctors, are correct. Reddick, supra, 157 F.3d at 725 (_citing_ Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss _all_ evidence presented." Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam). The ALJ must only explain why "significant probative evidence has been rejected." Id. (_quoting_ Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981)).

Dr. Schulze was one of plaintiff's treating physicians, and she provided specific opinions regarding plaintiff's functional abilities. She opined that Goodwin must change her body position every half hour to lessen otherwise intractable pain (Tr. 262). Dr.

Schulze also opined that plaintiff could not sustain a reasonable walking pace over a sufficient distance to be able to carry out her activities of daily living, and that she did not have the ability to travel without companion assistance (Tr. 263). She opined that plaintiff's medications and impairments affected plaintiff's ability for memory and concentration and that plaintiff's attention and concentration frequently were impaired (Tr. 264).

Dr. Schulze indicated that plaintiff was unable to sit for more than 30 minutes and then must walk for five minutes (Tr. 265). She also indicated that plaintiff likely would be absent from work more than four times a month on average due to her severe impairments (Tr. 266). Although Dr. Schulze gave her opinions on February 22, 2007, she indicated specifically that her assessments of plaintiff's symptoms and limitations were regarding the time frame beginning in September 10, 2001 (id.). Based on a review of the relevant record, discussed further below, see infra, section 3, the Court finds that Dr. Schulze's opinions regarding plaintiff's functional limitations are supported by substantial evidence in the record as a whole.

Because the ALJ did not adopt these opinions of Dr. Schulze in her residual functional capacity assessment, she needed to "explain why the opinion was not adopted." See SSR 96-8p, 1996 SSR LEXIS 5 at *20. The ALJ has not indicated how the opinions of Dr. Kevin P. Schoenfelder, M.D. ("Dr. Schoenfelder") or Dr. Elizabeth Cook, M.D. ("Dr. Cook") contradict Dr. Shulze's opinions, such as Dr. Shulze's opinion that plaintiff cannot sit for more than 30 minutes without having to walk for 5 minutes (see

Tr. 18). However, the ALJ appears to rely on the opinions of Drs. Schoenfelder and Cook (see Tr. 18).

The ALJ indicated that Dr. Schoenfelder had reported plaintiff's improvement following injections from approximately October 17, 2002 and April 29, 2004, as well as her usually excellent strength, which also was commented on by Dr. Cook (see Tr. 14). However, Dr. Schoenfelder also noted that plaintiff was "still symptomatic" on April 8, 2002 (Tr. 202); and, on May 30, 2002, Dr. Schoenfelder assessed that plaintiff had limitations on walking and activity (Tr. 185). It does not appear from a review of the record that Dr. Schulze's functional assessments were contradicted by plaintiff's other treating physicians, whose opinions the ALJ relies on in her written decision (Tr. 18). Therefore, the ALJ was required to provide "clear and convincing" reasons for rejecting the uncontradicted opinions of Dr. Schulze. See Lester, supra, 81 F.3d at 830.

The ALJ erroneously concluded that because Dr. Schulze's treating physician questionnaire was completed almost two years after plaintiff's date last insured that "it does not reflect the claimant's functional abilities during the relevant time period" (Tr. 15). This is inaccurate. Dr. Schulze specifically indicated that the limitations about which she gave her opinion existed on September 10, 2001 (Tr. 266). This first reason given by the ALJ provides no support for the decision not to adopt Dr. Schulze's opinions. Courts regularly have held that a medical opinion of a treating physician should not be rejected simply because it is given after the condition first appears. See Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1996) ("medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition") (citation

omitted); cf. <u>Taylor v. Comm'r SSA</u>, 659 F.3d 1228, 1232 (9th Cir. 2011) ("if the Appeals Council rejected Dr. Thompson's opinion because it believed it to concern a time after Taylor's insurance expired, its rejection was improper").

The ALJ also found that Dr. Schulze's opinion that plaintiff was unable to perform housework was inconsistent with a treatment note that plaintiff was becoming more active at home and doing housework (<u>see</u> Tr. 15-16). On December 30, 2003, Dr. Schulze reported plaintiff's subjective statement that she was unable to do anything (Tr. 336). Although plaintiff reported being more active with housework thereafter on July 13, 2004, she also indicated that she was in more pain at that time as it hurt more (Tr. 331). Shortly thereafter, Dr. Schulze also observed plaintiff "in a great deal of pain," on November 30, 2004, leading to the logical inference that plaintiff again was unable to do housework at that time (<u>see</u> Tr. 327). For these reasons, the Court finds that the ALJ's reliance on any potential inconsistency between Dr. Schulze's opinion that plaintiff could not do housework and plaintiff's reports of being more active and doing some housework provides only some support for the ALJ's rejections of Dr. Schulze's opinions regarding plaintiff's functional limitations.

The ALJ also rejects Dr. Schulze's opinions regarding plaintiff's functional impairments on her assessment that Dr. Schulze's response that plaintiff had no weakness, muscle atrophy or reflex abnormalities was inconsistent with her assessment that plaintiff rarely could lift less than 10 pounds and could not ever lift 10 pounds (<u>see</u> Tr. 15-16). However, these are not intrinsically inconsistent opinions. Although the ALJ finds that there was not an objective basis for Dr. Schulze's opinions regarding plaintiff's

lifting limitations, plaintiff's diagnoses of spinal stenosis and degenerative disc disease on the basis of her MRI scans as well as Dr. Schulze's objective observations of plaintiff's examination results provide the objective basis for such limitations (see Tr. 16; see also Tr. 12, 327, 395-96).

The ALJ also supports her rejection of Dr. Schulze's opinions by indicating that Dr. Schulze reported that plaintiff needed to use a cane on one page, while indicating the opposite on a different page (see Tr. 16). Again, a review of the record reveals that these opinions are not contradictory as the second reference regards an assisting device that limits the functioning of both upper extremities, and does not include an opinion that plaintiff does not need a cane (see Tr. 259, 263).

The ALJ indicates giving little weight to the functional opinions Dr. Schulze listed in her treating physician questionnaire because of the ALJ's assessment that the questionnaire "is internally inconsistent, does not reflect the substantial medical history of self-reported functional abilities and does not address the relevant time period" (Tr. 18). However, as discussed, the report is not internally inconsistent and it addresses the relevant time period. Regarding the question of whether or not substantial evidence supports the finding by the ALJ, the Court should "'review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Sandgathe v. Chater, 108 F.3d 978, 980 (1996) (per curiam) (*quoting* Andrews, supra, 53 F.3d at 1039). Based on this standard and the relevant record as a whole, the Court finds that the ALJ's assessment of Dr. Shulze's functional evaluation is not supported by substantial evidence in the medical record.

Based on the reasons stated and the relevant record, the Court concludes that the ALJ failed to provide clear and convincing reasons to give little weight to the uncontradicted opinions by Dr. Schulze regarding plaintiff's functional limitations. See Lester, supra, 81 F.3d at 830. Therefore, the ALJ did not evaluate properly the medical evidence and this matter should be reversed and remanded to the Commissioner for further administrative proceedings.

3.  The ALJ erred in the evaluation of plaintiff's credibility.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (*citing* 42 U.S.C. § 423(d)(5)(A)). Even if a claimant "has an ailment reasonably expected to produce *some* pain; many medical conditions produce pain not severe enough to preclude gainful employment." Fair, supra, 885 F.2d at 603. The ALJ may "draw inferences logically flowing from the evidence."  Sample, supra, 694 F.2d at 642 (*citing* Beane v. Richardson, 457 F.2d 758 (9th Cir. 1972); Wade v. Harris, 509 F. Supp. 19, 20 (N.D. Cal. 1980)).

Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citation omitted). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "'must specifically identify what testimony is credible and what evidence undermines the claimant's complaints.'" Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (*quoting* Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)); Reddick,

supra, 157 F.3d at 722 (citations omitted); Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." Smolen, supra, 80 F.3d at 1284.

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; Smolen, supra, 80 F.3d at 1281 (citing Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); Smolen, supra, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell v. Sullivan, 947 F.2d 341, 343, 346-47 (9th Cir. 1991) (en banc) (citing Cotton, 799 F.2d at 1407). Absent affirmative evidence that the claimant is malingering, the ALJ must provide specific "clear and convincing" reasons for rejecting the claimant's testimony. Smolen, supra, 80 F.3d at 1283-84; Reddick, supra, 157 F.3d at 722 (citing Lester, supra, 81 F.3d at 834; Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

Regarding activities of daily living, the Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . . does not in any

way detract from her credibility as to her overall disability." <u>Orn v. Astrue</u>, 495 F.3d 625, 639 (9th Cir. 2007 (*quoting* <u>Vertigan v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001)). The Ninth Circuit specified "the two grounds for using daily activities to form the basis of an adverse credibility determination:" (1) whether or not they contradict the claimant's other testimony; and (2) whether or not the activities of daily living meet "the threshold for transferable work skills." <u>Orn</u>, <u>supra</u>, 495 F.3d at 639 (*citing* <u>Fair</u>, <u>supra</u>, 885 F.2d at 603). As stated by the Ninth Circuit, the ALJ "must make 'specific findings relating to the daily activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. <u>Orn</u>, <u>supra</u>, 495 F.3d at 639 (*quoting* <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005)).

An "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints. . . . and there are no good reasons for this failure." SSR 96-7 1996 SSR LEXIS 4, at *21-*22. However, even if a condition could be remedied by surgery, if the claimant's "actions were reasonable under the circumstances, then the district court's judgment upholding the [written decision by the ALJ] must be reversed." <u>Nichols v. Califano</u>, 556 F.2d 931, 932 (9th Cir. 1977). A good reason can provide a valid excuse for not following prescribed treatment, such as that a treating family physician does not recommend the treatment, or that it is excessively painful or dangerous. 20 C.F.R. § 404.1530; SSR 96-7 1996 SSR LEXIS 4, at *21-*22; <u>Nichols</u>, <u>supra</u>, 556 F.2d at 933. In addition, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that

the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Social Security Ruling ("SSR") 96-7 1996 SSR LEXIS 4, at *21-*22.

The ALJ here cited no evidence of malingering; therefore, she was required to provide specific "clear and convincing" reasons for rejecting plaintiff's testimony. See Smolen, supra, 80 F.3d at 1283-84; Reddick, supra, 157 F.3d at 722. The ALJ found that plaintiff's determinable impairments reasonably could have been expected to cause some of the alleged symptoms, but gave various reasons for the finding that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the residual functional capacity assessment by the ALJ (Tr. 14).

The ALJ characterized plaintiff's testimony as follows:

> The claimant testified that she is unable to work because of extreme pain with burning and muscle spasms in her back which radiates down her hips and into her legs and limits her ability to sit for no more than 30 minutes at a time and stand or walk for no more than five minutes at a time. The claimant maintains that this pain has existed since at least 2001 and has increased in severity. The claimant testified that her pain is so severe that it causes her to lose sleep and concentration.

(Tr. 14).

a. The ALJ's assessment of inconsistency between plaintiff's reports of pain and her hearing testimony

The ALJ found that plaintiff's reports of pain in her medical record during the relevant period are inconsistent with her hearing testimony regarding her level of pain (Tr. 14). The ALJ noted that plaintiff's epidural steroid injections and oral medications

"were relatively effective" in controlling plaintiff's pain symptoms (id.). In support of this assessment, the ALJ discussed selections from plaintiff's medical record (id.). For example, the ALJ indicated that "[b]y October 17, 2002, the claimant was reporting almost complete relief from pain and Dr. Schoenfelder noted that her radiculopathy was resolving" (id.). The ALJ also cited a note from plaintiff's record that on one occasion, plaintiff reported that the positive effect of her epidural steroid injection had lasted for four months (id.). The ALJ concluded that plaintiff's "reports of pain relief were consistently reported to Dr. Schoenfelder through April 29, 2004, the date of her last visit with him" (id.). In a similar fashion, the ALJ cited an excerpt from plaintiff's treatment with Dr. Cook (id.).

In this context, the ALJ also discussed some of the medical reports of Dr. Schulze (Tr. 15). The ALJ noted a number of references to plaintiff's pain relief from her injections (id.). The ALJ also noted that on one occasion, plaintiff reported that she had felt better than she had in four years (id.). Finally, the ALJ indicated that on November 18, 2002, Dr. Schulze eliminated plaintiff's pain medication, Percodan; that by February 23, 2004, Dr. Schulze had discontinued Neurontin; and, on March 22, 2004 Dr. Schulze decreased Oxycontin (id.). The ALJ concluded that plaintiff's "positive reports of pain improvement over a significant period of time support the articulated residual functional capacity" (id.).

The implication by the ALJ that plaintiff's pain improved gradually over time is not supported by substantial evidence in the record. A review of the record reveals that plaintiff often was reporting pain symptoms and that she often reported that her

treatments only temporarily relieved her pain (see Tr. 176-210, 299-423) The ALJ appears to have selectively noted only portions of the record and failed to note the indications in the record that support plaintiff's testimony regarding her pain.

First, the Court notes that although the ALJ indicated that Dr. Schulze eliminated plaintiff's pain medication, Percodan, on November 18, 2002 (Tr. 15), the Court does not find evidence for this indication in the 125 page exhibit cited by the ALJ in support of this statement (see Tr. 299-423). Although a treatment note on November 18, 2002 indicates that plaintiff was reducing or "dropping off 1-2" of her Percodan, it does not indicate that this prescription was eliminated (see Tr. 349). This interpretation is buttressed by the treatment note shortly thereafter, from February 10, 2003, which indicates that plaintiff still was prescribed Percodan, as well as Oxycontin and Hydrocodone (see Tr. 348). The Court also notes that the November 18, 2002 treatment note indicates that although plaintiff's Oxycontin was reduced at this time, her Hydrocodone was maintained (Tr. 349).

Similarly, it appears from the record that Neurontin was discontinued on January 26, 2004 and Oxycontin was decreased on March 22, 2004, as noted by the ALJ. However, on March 22, 2004, plaintiff nevertheless still was prescribed Percodan and Vicodin (Tr. 333, 335). Perhaps more telling, although plaintiff's Oxycontin was decreased on March 22, 2004, Dr. Schulze prescribed Vicodin, Percodan and Oxycontin on April 19, 2004, less than a month later, after noting that plaintiff was "back up to the oxycontin 3 per day because of being two months out from her last shot" (Tr. 333). The

record reflects that although plaintiff reported experiencing pain relief from her steroid injections, she generally reported that this pain relief was temporary (see Tr. 333).

Examples of this are indicated throughout plaintiff's medical record. Although there is a single treatment note that indicates that plaintiff's pain relief lasted for four months following her injection (see Tr. 182), many other treatments notes indicate that they provided pain relief for a shorter amount of time (see, e.g., Tr. 182, 185). Although on July 14, 2003, plaintiff indicated that pain relief from her March, 2003 injection lasted for four months, at her very next treatment, she indicated that the pain relief she received from the July, 2003 injection was "not as good of relief that she got with her L4-5 posterior interlaminar injection done in March" (Tr. 181). Likewise, one of plaintiff's earlier treatment notes indicates that one of her injections provided her with pain relief for one month, while another treatment provided her with pain relief for two months (see Tr. 185). Plaintiff testified at her hearing that she had not been getting any relief from the injection in the six months prior to the hearing (Tr. 40). She also testified that before 2005, the injections "would help for about six to seven weeks, sometimes eight weeks in that just like the pills do in that they take some of the pain but not all of it" (id.).

On November 30, 2004, Dr. Schulze indicated her objective observation that plaintiff was "in a great deal of pain [and] [was] rocking back and forth" (Tr. 327). Although the ALJ fails to mention this treatment note, she referenced the following treatment note, after plaintiff's injection, in which plaintiff indicated that she felt better than she had felt in four years (see Tr. 15, 326). Similarly, the ALJ failed to mention other treatment notes when plaintiff indicated on July 3, 2003 that she had "the worst

pain that she has ever been in" (Tr. 252); on October 6, 2003 that she had "been in a great deal of pain" (Tr. 255); on December 30, 2003 that she was having "increasing problems" and shooting pains (Tr. 256); on April 19, 2005 that the "last shot was less effective" (Tr. 322); on May 19, 2005 that she suffered from "increased pain secondary to her most recent steroid shot being less effective" (Tr. 321); on June 14, 2005 that it had "been a bad three month period of time for her, given that her steroid shot did not seem as effective as previously [and] . . . . she ha[d] been flat with much more pain" (Tr. 320); on March 29, 2006 that she had "been in a great deal of pain, despite being medicated" (Tr. 313); on August 17, 2006 that "she ha[d] been unhappy with the inconsistencies of pain relief" (Tr. 309); on September 14, 2006 that she had "been in more pain than usual" (Tr. 308); and, on March 27, 2007 that she "did not get much result from her last epidural steroid injection. Every other epidural injection that she gets at UW is inadequate and just increases her suffering" (Tr. 304).

Although some of these aforementioned treatment notes were subsequent to plaintiff's last insured date, many were from the relevant period, and when viewed in total, they demonstrate that plaintiff's self-reports of pain were not inconsistent with her August 14, 2009 testimony that her pain had "increased in severity," as referenced by the ALJ (see Tr. 14). The ALJ appears to have concluded that the limiting effects of plaintiff's pain improved over time by failing to consider significant probative evidence to the contrary. Although an ALJ "need not discuss *all* evidence presented," the ALJ must explain why "significant probative evidence has been rejected." Vincent, supra, 739 F.2d at 1394-95.

The Court also notes that Dr. Schulze opined in a December, 2009 letter that whenever her treatment notes in plaintiff's record indicated that plaintiff was "doing well or had improved, all of these were short term improvements, and almost all of them followed a time in which there was either another epidural steroid injection or an increase in her narcotic use" (Tr. 175). Dr. Schulze opined further that if one was to graph plaintiff's "use of narcotics to control her pain and her activity over the years, you would see a complete worsening of her overall condition due to her spinal disk disease and severe spinal stenosis and an increasing amount of narcotics to help control her symptoms and help her function at minimal levels . . . she was having increasing pain over the last eight years" (id.). Although the Court does not rely on Dr. Schulze's opinions in her letter, based on the relevant record, the Court concludes that the ALJ's implications that plaintiff's pain symptoms gradually decreased over time and increasingly were managed by treatment are not supported by substantial evidence in the record. Therefore, the ALJ's finding of an inconsistency between plaintiff's reports of pain and her hearing testimony of the limiting effects of her pain is not supported by substantial evidence in the record.

b.  Objective medical evidence

The ALJ indicates in the context of evaluating plaintiff's credibility that the "objective medical evidence also supports a sedentary residual functional capacity" (Tr. 15). The Court notes again that once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully

corroborate the alleged severity of pain." <u>Bunnell</u>, <u>supra</u>, 947 F.2d at 343, 346-47. In addition, again, the ALJ appears to have provided a selective review of the medical evidence.

For example, the ALJ references a September 25, 2001 treatment note that plaintiff's "straight leg raising was negative" (Tr. 15; <u>see also</u> Tr. 189). However, the ALJ fails to mention a subsequent treatment note on November 30, 2005 that "[e]xam continues to show positive straight leg raise, bilaterally, and tenderness in the lumbar spine" (Tr. 327). Based on a review of the relevant record, the Court concludes that although the objective evidence in the medical record is a relevant factor in determining plaintiff's credibility, here it does not provide substantial evidence to discount plaintiff's credibility.

c. Plaintiff's compliance with doctors' recommendations

The ALJ assessed that plaintiff failed to follow-up on recommendations made by her treating doctors and that this indicated that plaintiff's "symptoms may not have been as serious as has been alleged in connection with this application and appeal" (Tr. 16). In this context, the ALJ noted recommendations that plaintiff lose weight, undergo gastric banding and a laminectomy, engage in pool therapy as a weight-loss measure, receive acupuncture and go to a pain clinic (Tr. 16-17).

1. Pool therapy and exercise

Regarding pool therapy, the ALJ noted that plaintiff "attended irregularly, sometimes two times per week, sometimes three times and sometimes not at all" (Tr. 16) and also noted plaintiff's testimony that she had not attended pool therapy in the year

prior to the hearing because her husband could not take her (Tr. 17; <u>see also</u> Tr. 31). The ALJ did not indicate whether or not she was relying on the fact that plaintiff could not attend pool therapy in the year prior to her August, 2009 hearing to determine that plaintiff's testimony regarding her pain symptoms during the relevant time frame was not credible. And, the ALJ did not indicate whether or not she accepted plaintiff's reason as to why she was not attending pool therapy in the prior year (<u>see</u> Tr. 17). The Court notes that the year prior to plaintiff's hearing was not part of the relevant time frame (of September 10, 2001 through March 31, 2005).

During the relevant time frame, the record on September 10, 2001 indicates that plaintiff was "not exercising in the pool due to pain" (Tr. 412). On April 4, 2002, treatment records indicate that plaintiff was "very serious about getting back into regular exercise, especially at the pool with the physical therapist" (Tr. 356). This treatment note also indicates a potential reason as to why plaintiff had not been engaging in pool therapy recently as she was "in so much pain that she [was] unable to get dressed by herself" (<u>id.</u>). On May 23, 2002, treatment records indicate that plaintiff was "in physical therapy twice a week" (Tr. 353). On August 19, 2002, treatment records indicate that plaintiff was "trying to get to exercise more often" (Tr. 351).

Treatment records from December 16, 2002 substantiate the implication from the April 4, 2002 note that plaintiff increased her exercise when her pain decreased: "Her pain is improved and she is back to exercising more regularly" (Tr. 347). On April 18, 2003, plaintiff was exercising and "swimming a great deal" (Tr. 346). On March 14, 2003, treatment records indicate that plaintiff was "doing better with her exercise. She is

exercising three times per week" (Tr. 345). On July 3, 2003, plaintiff was "still working out in the pool at least 3 x per week" (Tr. 343). On October 6, 2003, plaintiff had "started to exercise a bit more, but she ha[d] been in a great deal of pain" (Tr. 339).

A treatment note from December 30, 2003 indicates that plaintiff had not been able to exercise at all for a week due to "shooting pains" (Tr. 336). On February, 23, 2004, treatment notes indicate that plaintiff was "exercising three times per week" (Tr. 334). On April 19, 2004, treatment notes indicate that plaintiff was continuing "to exercise at least three times per week" (Tr. 333).

On May 17, 2004, the record indicates that plaintiff still was "exercising three times, sometimes four times a week" (Tr. 332). The record reflects that on July 13, 2004 that plaintiff was "driving more she hopes to make it to swimming more often" (Tr. 331). On October 29, 2004, the record indicates that plaintiff still was "keeping with her exercise" (Tr. 328). In addition, the record reflects on December 28, 2004 that plaintiff was trying to exercise three days per week, and on January 27, 2005 that plaintiff still was "active in a pool program" (Tr. 326). On March 22, 2005, the record indicates that plaintiff was "involved in aqua-therapy twice per week" (Tr. 324).

Based on the relevant record, the Court concludes that the ALJ's implication that plaintiff had not been compliant with recommendations to exercise and engage in pool therapy is not supported by substantial evidence in the record as a whole. In addition, the Court notes that the ALJ failed to assess the logical inference from the record that plaintiff's pool therapy compliance decreased when her pain increased.

### 2. Surgery recommendations

Regarding surgery, the ALJ noted that a treatment note by Dr. Cook which indicated that plaintiff's weight "goes against any possibility of surgery (laminectomy) being successful" (Tr. 16 (*citing* Tr. 182)). The ALJ also noted that Dr. Schoenfelder and Dr. Cook apparently were recommending surgery to plaintiff in October, 2004 (Tr. 16; see also Tr. 328).

Plaintiff testified that she met with Dr. Schoenfelder in 2002 and he explained what he could do (Tr. 37). Plaintiff testified that:

> He gave me about a 50 percent chance of having any recovery. And it was a lot of surgery and a lot of recovery to go through for a 50 percent chance of no pain. He was very honest about saying that doing the surgery would most likely damage a lot of the nerves in the spinal cord that will have to grow back and sometimes don't. And so that was the unknown in doing the surgery. My brother is a radiologist and he was encouraging me to wait as long as I could to do surgery because they would be coming up with more and more improvements in and new things to do that would not be so destructive. And then I began getting epidural, steroid shots both at, I started at St. Joe's Hospital in Tacoma and then after a few years there I went up to Virginia Mason to their pain clinic up there. And I'd go every three months for a steroid injection.

(Tr. 37-38). In addition to her hearing testimony, the record reflects some of the reasons for plaintiff's lack of surgical intervention.

On January 15, 2002, the record indicates that plaintiff was "very frightened of surgery as she knows she has facet involvement and she is concerned about the instability after surgery" (Tr. 411). On March 5, 2002, the record indicates that plaintiff was "very recalcitrant concerning surgery because of her body habitus and her fear that surgery could kill her" (Tr. 408). In late 2002, Dr. Schoenfelder indicated that plaintiff wanted to

pursue injections verses surgery in the future, and that he was "inclined to agree with her especially until she gets under a more healthy situation" (Tr. 184). The ALJ did not indicate whether or not she considered plaintiff's reasons as to why she was reluctant to have surgery before concluding that plaintiff's failure to obtain surgery suggested that plaintiff was not credible regarding her level of pain. This was legal error. See SSR 96-7 1996 SSR LEXIS 4, at *21-*22.

3. Acupuncture and the pain clinic

Regarding acupuncture and the pain clinic, the record on March 5, 2002 indicates that plaintiff did not want to participate in these "as she states it is too time consuming and she has trouble with child care" (Tr. 408). However, a March 27, 2002 treatment note indicates that plaintiff was starting acupuncture the following week (Tr. 404). On April 4, 2002, treatment records indicate that plaintiff had "one session of acupuncture" (Tr. 356). Treatment records on April 26, 2002 indicate that plaintiff "will continue acupuncture" (Tr. 355). The ALJ did not indicate what consideration, if any, was given to plaintiff's reasons for failing to seek more acupuncture and other treatment at the pain clinic.

4. Weight loss

Regarding weight loss, many treatment records indicate that plaintiff was exercising, as discussed in the context of pool therapy. There also are indications of some weight loss (see e.g., Tr. 352 ("she has lost 20 lbs")). Treatment records from December 16, 2002 indicate that plaintiff was continuing "to lose weight slowly" (Tr. 347). A treatment note from March 22, 2004 indicates that plaintiff had "lost weight on the Meridia" (Tr. 333). Plaintiff "continue[d] to lose some weight" on April 19, 2004,

although it was "only about 2 lbs from last time" (id.). Plaintiff testified at her hearing that although she had gained about 60 pounds previously, she had "recently lost 50 pounds over the last year" (Tr. 25).

As indicated, the Court concludes that the ALJ's determination regarding plaintiff's lack of compliance with doctors' recommendations regarding exercise and pool therapy is not supported by substantial evidence in the record. In addition, the ALJ did not address plaintiff's reasons for the time periods in which she was less compliant with such recommendations, such as the multiple references in the treatment records that she decreased her exercise when her pain was too great (see, e.g., Tr. 189 (plaintiff "has been in an aqua aerobics program, but she had to stop that because of increasing problems with pain")). The ALJ also failed to consider plaintiff's reasons for failing to receive surgery, such as her testimony that the doctor informed her of a 50 percent chance of success (Tr. 37); her testimony that her brother who was a radiologist suggested that she wait (Tr. 38); and, the reference in her medical record that she feared that surgery could kill her (Tr. 408) or make her unstable (Tr. 411). The ALJ also failed to assess the validity of the reasons plaintiff indicated in the treatment record as to why she was not receiving acupuncture or going to the pain clinic (Tr. 408).

According to Social Security Ruling SSR 96-7, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7

1996 SSR LEXIS 4, at *21-*22. Therefore, the ALJ's failure to consider the stated

factors was legal error. For this reason, the other reasons discussed and the relevant

record, the Court finds that plaintiff's assessed failure to follow doctors'

recommendations provides little support for the ALJ's determination regarding plaintiff's

credibility.

    d.  Plaintiff's activities of daily living

        The ALJ concludes that plaintiff's "testimony regarding limitations in her

activities of daily living is inconsistent with her reports of activities in the medical

records" (Tr. 17). The ALJ supports this conclusion, in part, by noting plaintiff's multiple

travels, including a trip to the ocean, flying to Georgia for a wedding and a trip to

California (see id.). Although on August 19, 2002 a treatment note indicates that plaintiff

went to the ocean, it also indicates that plaintiff had problems coming back (Tr. 351).

Similarly, the Court notes that the treatment note from December 16, 2002 indicates that

plaintiff requested more pain pills due to the fact that she was flying, leading to the

logical inference that although she was able to manage this task, it was with difficulty and

increased narcotic pain medication (see Tr. 347; see also Tr. 333 ("extras for her trip to

California")).

        Other daily activities mentioned by the ALJ in addition to plaintiff's travel, was

her ability to drive and a reference to being more active at home (see Tr. 17). The ALJ

found that plaintiff's ability to travel, even with pain and on increased narcotics, and her

ability to drive and be more active at home suggested that plaintiff was not credible regarding the degree to which she alleged disability due to pain (id.).

There are "two grounds for using daily activities to form the basis of an adverse credibility determination:" (1) whether or not they contradict the claimant's other testimony and (2) whether or not the activities of daily living meet "the threshold for transferable work skills." Orn, supra, 495 F.3d at 639 (*citing* Fair, supra, 885 F.2d at 603). The ALJ did not indicate specifically that plaintiff's travel, ability to drive and her increased activity with the household chores were transferable to a work environment. See Orn, supra, 495 F.3d at 639 (*quoting* Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)). In addition, the ALJ has not demonstrated how plaintiff's daily activities contradict her other testimony. See Orn, supra, 495 F.3d at 639. Therefore, the Court concludes that the ALJ's references to plaintiff's daily activities provide little support for the ALJ's credibility determination.

Although the ALJ referenced some significant probative evidence regarding plaintiff's positive abilities, the ALJ neglected to mention much of the significant probative evidence suggesting that plaintiff suffered severe limitations in her ability to function. The Court should "'review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" Sandgathe v. Chater, 108 F.3d 978, 980 (1996) (per curiam) (*quoting* Andrews, supra, 53 F.3d at 1039). Based on a review of the relevant record as a whole and for the reasons stated, the Court concludes that the ALJ's reasons for her credibility determination were not clear and convincing overall. See Smolen, supra, 80 F.3d at 1283-84; Reddick, supra,

157 F.3d at 722. In addition, a determination of plaintiff's credibility relies on the assessment of the medical evidence and the Court already has determined that the ALJ did not evaluate properly the medical evidence, see supra, section 2. See also 20 C.F.R. § 404.1529(c). Therefore, the Administrative Law Judge assigned to this matter following remand should assess plaintiff's credibility anew.

4. The lay testimony should be re-evaluated.

Pursuant to the relevant federal regulations, in addition to "acceptable medical sources," that is, sources "who can provide evidence to establish an impairment," see 20 C.F.R. § 404.1513 (a), there are "other sources," such as friends and family members, who are defined as "other non-medical sources," see 20 C.F.R. § 404.1513 (d)(4), and "other sources" such as nurse practitioners and naturopaths, who are considered other medical sources, see 20 C.F.R. § 404.1513 (d)(1). See also Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223-24 (9th Cir. 2010) (citing 20 C.F.R. § 404.1513(a), (d), (d)(3)). An ALJ may disregard opinion evidence provided by "other sources," characterized by the Ninth Circuit as lay testimony, "if the ALJ 'gives reasons germane to each witness for doing so." Turner, supra, 613 F.3d at 1224 (citing Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)); see also Van Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). This is because "[i]n determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)).

Recently, the Ninth Circuit characterized lay witness testimony as "competent evidence," again concluding that in order for such evidence to be disregarded, "the ALJ must provide 'reasons that are germane to each witness.'" Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (*quoting* Van Nguyen, supra, 100 F.3d at 1467). In this recent Ninth Circuit case, the court noted that an ALJ may not discredit "lay testimony as not supported by medical evidence in the record." Bruce, supra, 557 F.3d at 1116 (*citing* Smolen, supra, 80 F.3d at 1289).

Testimony from "other non-medical sources," such as friends and family members, see 20 C.F.R. § 404.1513 (d)(4), may not be disregarded simply because of their relationship to the claimant or because of any potential financial interest in the claimant's disability benefits. Valentine v. Comm'r SSA, 574 F.3d 685, 694 (9th Cir. 2009).

a. Mr. Paul Joseph Goodwin, plaintiff's spouse ("Mr. Goodwin")

Mr. Goodwin testified at plaintiff's hearing (see Tr. 44-47). He testified that before her back pain started, she "was very active, engaged in sports" (Tr. 45). He testified further as follows:

> Okay, so Laurie was very active when we initially met and then got married. We would travel by car to a lot of areas. We would hike, we would camp. We would exercise together. One of our first apartments was near a high school and we would go to the track and walk and run and do other kinds of exercises. We would go and see shows. We would entertain our friends. We would go and visit and have dinner parties with our friends. Frequently we would take day trips over the weekends to explore Washington when we first moved here.

(id.).

When asked by the attorney about how things changed in plaintiff's life after the

back pain, Mr. Goodwin testified that:

> Around 2000, late 2000, 2001. She began expressing some difficulties
> with her back and pain in her legs and then we would, it kind of began to
> curtail our activity. Didn't quite feel like going and doing things. Like
> around that timeframe I started helping more with meals and cleaning to
> give her a chance to rest and, you know, let the pain subside and that
> kind of a thing. But as time progressed, it got worse. And I took over
> more responsibilities of the house and with the chores and the shopping
> and that kind of stuff.

(Tr. 45-46). Mr. Goodwin specified the reasons for the changes:

> Continuing problems with her back that seemed to get worse. Kept her
> less mobile. She had trouble getting from place to place. I began having
> to, you know, let her lean on me or help her walk, you know. Like from
> the house to the car and back. She was less inclined to go out and do a
> little shopping for just odds and ends. And like I said, things seemed to
> get gradually worse. She had more pain. She was less able to sit up and
> do things. Even she found that she had to recline to take the pressure off
> of where she was in pain.

(Tr. 46). Mr. Goodwin provided approximately 2 1/2 pages of testimony (see Tr. 44-47).

The ALJ gave one reason to disregard the lay testimony provided by plaintiff's

husband (see Tr. 17). The ALJ indicated that contrary to plaintiff's numerous records of

travel occurrences, Mr. Goodwin "testified that the claimant has been unable to travel

since her back problems began" (id.). Based on the relevant record, it is not clear how

Mr. Goodwin testified that plaintiff was unable to travel since her back problems began

(see Tr. 44-47). Although he indicated that she was less inclined to want to go out and do

things, he testified that he would help her from the car and back on the occasions when

she did leave the house. He testified to other functional changes in plaintiff's abilities

related to activities of daily living, such as the fact that he had increased his help with chores (see id.).

The ALJ's assessment that Mr. Goodwin "testified that the claimant has been unable to travel since her back problems began" is not supported by substantial evidence in the record, and therefore, is not a germane reason to discount his testimony (see Tr. 17). See Bruce, supra, 557 F.3d at 1115. According to the Ninth Circuit, "where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout, supra, 454 F.3d at 1056 (reviewing cases). Because the Court cannot so conclude with confidence, the Administrative Law Judge assigned to this matter following remand should re-assess the lay testimony provided by Mr. Goodwin. See id.

> b.  Lay evidence provided by other medical source, Ms. Susan E. Strobel, D.C. ("Ms. Strobel")

Ms. Strobel opined that plaintiff had "difficulty standing, bending, walking, for any distance, as well as sitting" (Tr. 270). Ms. Strobel indicated her assessment that plaintiff's injections gave plaintiff "only temporary relief" (id.). She assessed that plaintiff's pain level, when not decreased from the injections, was "an 8 on a 1-10 pain scale" (id.). The ALJ accorded Strobel's opinion "minimal weight because her opinion is unsupported by objective evidence, is inconsistent with the claimant's own report to her

treating physician of levels of pain during the relevant period and it is inconsistent with acceptable medical source opinions" (Tr. 18).

However, the ALJ has not indicated any specific inconsistency between Ms. Strobel's opinion and any opinion by an acceptable medical source. Also, as discussed previously, see supra, section 3, the Court has found that the ALJ reviewed plaintiff's self-reports of pain very selectively, with a focus only on indications of pain relief. In addition, the Court already has concluded that the ALJ erred in her opinion regarding the review of the medical evidence, as well as in her review of plaintiff's credibility, see supra, sections 2, 3. For these reason and based on the relevant record, the Court concludes that the Administrative Law Judge assigned to this matter following remand should re-assess the lay testimony provided by Ms. Strobel.

5. The residual functional capacity determination should be assessed anew and this matter should be remanded for further administrative proceedings.

Dr. Schulze provided detailed opinions regarding plaintiff's functional limitations. However the ALJ did not adopt Dr. Schulze's opinions when making her determination regarding plaintiff's residual functional capacity. Instead, the ALJ relied on other opinions, such as the opinions of Drs. Schoenfelder and Cook, without discussing any specific functional assessments provided by other medical sources. Therefore, the Court concludes that the residual functional capacity assessment of plaintiff is not based on a proper review of the medical evidence.

The Ninth Circuit has put forth a "test for determining when evidence should be credited and an immediate award of benefits directed." <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178, 2000 U.S. App. LEXIS 38646 at **17 (9th Cir. 2000). It is appropriate where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

<u>Harman</u>, 211 F.3d at 1178 (*quoting* <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir.1996)).

Here, outstanding issues must be resolved. <u>See</u> <u>Smolen</u>, 80 F.3d at 1292. There is a large volume of medical and other evidence. In addition, although the ALJ did not provide clear and convincing reasons to fail to adopt the functional assessments by treating physician, Dr. Schultze, plaintiff had other treating physicians. The ALJ may find it helpful to develop the record with respect to the opinions by plaintiff's other treating physicians regarding plaintiff's functional limitations. The medical evidence is not conclusive.

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995). If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th

Cir. 1999) (*quoting* <u>Waters v. Gardner</u>, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing*

<u>Calhoun v. Bailar</u>, 626 F.2d 145, 150 (9th Cir. 1980))).

Therefore, remand is appropriate to allow the Commissioner the opportunity to

consider properly all of the medical evidence as a whole and to incorporate the properly

considered medical evidence into the consideration of plaintiff's credibility and residual

functional capacity. <u>See</u> <u>Sample</u>, <u>supra</u>, 694 F.2d at 642.

6.  <u>Regarding plaintiff's contention of the ALJ's bias.</u>

Administrative Law Judges "are presumed to be unbiased." <u>Rollins v. Massanari</u>,

261 F.3d 853, 857 (9th Cir. 2001). To rebut this presumption, one must show a "conflict

of interest or some other specific reason for disqualification." <u>Id.</u> at 857-58 (*citing*

<u>Verduzco v. Apfel</u>, 188 F.3d 1087, 1089 (9th Cir. 1999)). Although ALJs occasionally

can reveal irritation or anger, "'expressions of impatience, dissatisfaction, annoyance, and

even anger, that are within the bounds of what imperfect men and women … sometimes

display,' do not establish bias." <u>Rollins</u>, <u>supra</u>, 261 F.3d at 858 (*quoting* <u>Liteky v. United</u>

<u>States</u>, 510 U.S. 540, 555-56 (1994)). Instead, a claimant asserting bias must "show that

the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear

inability to render fair judgment.'" <u>Rollins</u>, <u>supra</u>, 261 F.3d at 858 (*quoting* <u>Liteky</u>, <u>supra</u>,

510 U.S. at 551).

Here, plaintiff contends that the ALJ was biased (<u>see</u> Opening Brief, ECF No. 11,

p. 20). She asserts that the ALJ is not capable of fairly considering plaintiff's claim

following remand, as demonstrated by the ALJ's "incorrect findings rejecting the

credibility of both [plaintiff] and her husband" (<u>id.</u>). Although the Court has found that

the ALJ committed legal errors, these errors were not "'so extreme as to display clear inability to render fair judgment.'" See Rollins, supra, 261 F.3d at 858 (*quoting* Liteky, supra, 510 U.S. at 551). For this reason, the Court should not order that this matter must be heard by a different Administrative Law Judge following remand.

CONCLUSION

The ALJ failed to evaluate properly the medical evidence and erred in her assessment of the medical opinions of Dr. Schulze. In addition, the ALJ failed to evaluate properly plaintiff's credibility.

Based on these reasons and the relevant record, the undersigned recommends that this matter be **REVERSED** and **REMANDED** to the administration for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **JUDGMENT** should be for **PLAINTIFF** and the case should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. See 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on January 13**,** 2012, as noted in the caption.

Dated this 21st day of December, 2011.

J. Richard Creatura
United States Magistrate Judge